UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D
OCT 18 2005
J T NOBLIN CLERK
BY_____ DEPUTY

UNITED STATES OF AMERICA
ex rel. RAYMOND BURK                                                PLAINTIFF

VS.                                             CIVIL ACTION NO. 3:05cv629 HB-AGN

AKAL SECURITY, INC. d/b/a AKAL
SECURITY SERVICES and JOHN DOE INDIVIDUALS
and CORPORATIONS 1-25                                          DEFENDANTS

**UNITED STATES OF AMERICA'S COMPLAINT UNDER SEAL**
**(JURY TRIAL DEMANDED)**

### I. INTRODUCTION

1. The United States brings this action under seal to recover treble damages, attorneys fees, expenses and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), and to recover damages and other monetary relief under the common law or equitable theories of fraud, unjust enrichment, payment by mistake of fact, and recoupment and disgorgement of illegal profits.

2. Akal Security, Inc. d/b/a Akal Security Services and/or John Doe Individuals and Corporations 1-25 contracted with the U.S. Marshal Services in the Southern District of Mississippi and throughout all of the United States to provide court security services at United States Courthouses across the United States of America. The Defendants are collectively referred to hereinafter as "Akal".

3. These claims are based upon the Akal's submission of false and fraudulent invoices, claims and reports to the United States in order to obtain millions of dollars in payments for services at least from October 1, 2001 through the present. Akal started providing courthouse security through its USMS Division in 1992.

1

4. Akal also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to the United States Marshal's Service and other government programs. Akal falsely certified that the invoices, claims and statements were "true" and/or "correct" and as such were entitled to payment. Akal knew, or acted with reckless disregard or deliberate ignorance of the fact, that such statements were false or fraudulent and that the services required under the various contracts for court security had not been provided or had been provided for shorter periods of time than claimed.

5. Akal also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2), that the services identified in its reports were provided in compliance with federal law and the terms of various contracts, including MS-02-D-0001. A true and correct copy of all available portions of Contract MS-02-D-0001 is appended as Exhibit "A". The false certifications, made with each invoice submitted to the government between 2001 and the present, and potentially before, were part of defendants' unlawful scheme to defraud the United States Marshal's Service and other government programs and were submitted pursuant to a pattern and practice accepted by Akal. Akal knew, or acted with reckless disregard or deliberated ignorance of the fact, that such statements were false or fraudulent.

6. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because Akal had no entitlement to payment for services that were not in fact provided. Nevertheless, Akal accepted payments from the United States pursuant to the false invoices.

7. These claims were false because Akal had no entitlement to payment for services that were not performed or were not performed according to various contract terms. Akal therefore conspired together to defraud the United States by getting false and/or fraudulent claims

2

paid, in violation of 31 U.S.C. § 3729(a)(3).

8. Based in whole or in large part on this unlawful, fraudulent scheme since at least 2001, Akal became the largest court security contractor for the U.S. Marshal's Service. Upon information and belief, Akal successfully bid for contracts for all U.S. Court of Appeal Circuit territories save one. Akal now has net assets of millions of dollars, annual revenue of over 350 million dollars, and contracts with the United States worth over 1.0 billion dollars. Akal has over 12,000 employees throughout the country, most of whom submit daily time logs for their services. The United States is Akal's biggest client.

## II. JURISDICTION

9. The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants resides or transacts business in the Southern District of Mississippi.

## III. VENUE

10. Venue is proper in the Southern District of Mississippi under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the defendants resides or transacts business in that District.

## IV. PARTIES

11. The United States brings this action on behalf of the United States Marshal's Service ("USMS").

12. Raymond Burk ("Mr. Burk") is an individual residing in Brandon, Mississippi, in Rankin County, in the Southern District of Mississippi. Pursuant to 31 U.S.C. § 3730(b)(1), Mr.

3

Burk brought this action against Akal on behalf of himself and the United States.

13.  Akal Security, Inc. is a New Mexico corporation formed in 1993, and has registered to conduct business in the State of Mississippi.

14.  Akal is liable in this action for the conduct of its agents and employees through the doctrine of *respondeat superior*. Akal is liable for their conduct directly, because they or their predecessors committed, participated in or caused the acts described herein, and derivatively, because it or its predecessors employed the individuals who worked in the various courthouses and caused the false claims to be submitted to the United States and Akal accepted payment of the false or fraudulent invoices.

## V.  THE LAW

### A.  The False Claims Act

15.  The False Claims Act ("FCA") provides, in pertinent part that:

>   (a)  Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the *Government* by getting a false or fraudulent claim paid or approved by the Government; . . .
>
>   * * *
>
>   is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the *amount of damages* which the Government sustains because of the act of that person . . . .
>   (b) For purposes of this section, the terms "knowing" and "knowingly" means that a person, with respect to information (1) has knowledge of the information; (2) acts in deliberate

4

Case 3:05-cv-00629-DPJ-LRA   Document 1   Filed 10/18/2005   Page 5 of 19

>       ignorance of the truth or falsity of the information; or (3) acts
>       in reckless disregard of the truth or falsity of the information,
>       and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## VI. THE CONTRACT

16.     At least since the 1990's, the United States government, in an effort to maximize security while minimizing costs at various government facilities, elected to contract with private entities for the provision of security services at various governmental locations. The various sites involved include over 85% of the United States Courthouses and various military bases throughout the United States. In fact, the United States recently hired Akal to provide security at important military installations including Fort Campbell Kentucky, Fort Stewart Georgia, Anniston Army Depot Alabama, Blue Grass Army Depot Kentucky and Fort Hood Texas. Akal has also contracted with the Department of Homeland Security to provide various security services, including airport security.

17.     As part of its effort to contract fairly and efficiently with private security firms, the United States would issue various solicitations for security services through the General Accounting Office of the United States and increased these solicitations following the September 11, 2001 terrorist attack.

18.     Over the past fifteen (15) years, Akal Security, Inc. of Santa Cruz and Espanola, New Mexico has responded to various security services solicitations by the United States, and particularly the United States Marshal's Service, and has been awarded security contracts in locations throughout the country. Ironically, Akal is wholly owned by the Sikh Dharma, a non-profit religious group tracing its roots to India.

5

19.  In 2001, Akal Security, Inc. responded to a solicitation by the United States General Accounting Office for proposals for the provision of Court Security Services for the Fifth Judicial Circuit in accordance with Solicitation #MS-01-R-0006, dated March 11, 2001 with amendments.

20.  Akal was awarded the contract which paid $5,903,012.64 annually for security services. The contract is MS-02-D-001 having an effective date of October 01, 2001 (the "Contract"). Akal's contracting agent for the contract was its Vice-President Daya S. Khalsa, Sr. Upon information and belief, the Contract had an initial one (1) year period through September 30, 2002 and has been renewed annually to the present.

21.  According to the Contract, Akal shall "provide all necessary manpower, supervision, transportation, equipment, and clothing . . . to perform court security services for each USMS (United States Marshals Service) district covered by this Contract." *See* Contract, p C-1, ¶ C-2.

22.  Court security services for the courthouses of the United States District Courts for the Southern Districts of Mississippi were included in the Contract.

23.  According to the Contract, Akal was required to provide various contract personnel. Those personnel would include Site Supervisors, Lead Court Security Officers (LCSO's) and Court Security Officers (CSO's). Each was given a specific, important role in the contract performance.

24.  According to the Contract, Site Supervisors "shall oversee and manage the day-to-day operations of the CSO workforce at their respective district . . . . The Site Supervisor shall be responsible for overall quality control of the security services provided by the CSOs." Other requirements also apply to Site Supervisors.

25.  According to the Contract, each facility shall be provided a Lead Court Security Officer. "The LCSO shall coordinate daily activities at their respective facility . . . and provide a

direct degree of supervision for the daily work of the CSOs . . . ." The LCSO for each location was charged with verifying the accuracy of the time records of each employee.

26.     According to the Contract, the CSOs duties are to "provide for the complete safety and security of judges, court personnel, jurors, witnesses, defendants, federal property and the public." It was the express intention of the U.S. Marshal Service to maintain consistency in CSO duties in order to provide the *maximum* amount of security possible. This was understood by Akal as a material contract provision. *See* Contract, p. C-4, ¶ C-5(d)(1)(emphasis added).

27.     Watching television, listening to portable or personal radios, reading books, newspapers, and any material not associated with official business is prohibited by the Contract. *See* Contract, p. C-5, ¶ C-5(d)(1)(iii).

28.     Each position allowed by the Contract required Akal to provide one CSO forty (40) hours each week, less Federal holidays and other days when the court is closed. *See* Contract, p. C-7, ¶ C-5(d)(2).

29.     According to the Contract, Akal was/is responsible for maintaining satisfactory standards of employee competency, conduct, appearance, and integrity and shall ensure that all its employees adhere to the Standards of Conduct and meet all applicable health and fitness requirements. Akal was/is responsible for taking such disciplinary action as necessary when its employees fail to meet such contract standards or requirements. Failure to do so constitutes contractor non-performance. *See* Contract, p. C-18.

30.     Akal agreed as part of the Contract that Akal personnel shall not consume alcoholic substances on duty or a minimum of eight (8) hours prior to reporting for duty. *See* Contract, p. C-23, ¶ C-15(c).

31.     According to the Contract, no CSO shall be authorized to leave their station during their shift except when the CSO is authorized to take breaks or lunch. Each CSO position will be allowed a 15-minute morning "break", a 15-minute afternoon "break", and a 1/2 hour lunch. It is the duty of Akal to coordinate a schedule for CSOs so that security levels are maintained during break/lunch periods. *See* Contract, p. C-4, ¶ C-15.

32.     According to the Contract, contract performance by Akal shall be considered deficient whenever posts are not covered as required by the contract. E-1(c).

33.     The Contract requires contract personnel to prepare various reports on daily, monthly, quarterly or annual bases to the United States. The reports require Akal to report truthfully and accurately to the United States about the activity of contract personnel. Included in the required truthful, accurate reporting is the Daily Attendance Log and Court Security Officer Sign In and Sign Out Record.

34.     The Contract requires that all Site Supervisors, LCSOs, and CSOs shall sign in when reporting for duty and sign out when leaving at the end of the work day. The sign-in and sign-out record must show the date, time in, time out, names of each site supervisor, LCSO, and CSO, signatures of each and the actual man hours worked by each. If any personnel is absent for any reason, an indication of why that individual is not present shall be provided in the log. The LSCO is responsible for personally notifying the U.S. Marshal Service Technical Officer or his designee of the status of CSOs assigned to the facility and of any unoccupied post, as well as actions taken for replacement. *See* Contract, p. C-33-34. All contractor personnel performing work at the USMS site shall sign in when reporting for duty and sign out when leaving at the end of the work day on a "Record of Time Arrival and Departure Form H-7." Each time this report is submitted for payroll

and payment purposes, the Lead CSO is required to certify that the information reflected on the sign-in and sign-out record is correct.

35.    Invoices for services under the Contract are to be submitted on a monthly basis to the United States Marshal's Service. Each invoice shall include a description and the quantity of supplies or services furnished . . . and Akal's contracting officer shall certify that "to the best of my knowledge and belief that the services shown on this invoice have been received and are accepted." Akal agreed that payment shall only be due after contract performance/payment of CSO and government acceptance of services, and after receipt of a proper invoice and required monthly activity report and only for the number of hours actually performed . . . . G-3, 4.

36.    The Southern Division of Mississippi was allotted by Contract 19 full-time CSO positions and 14 shared-time positions. The total positions equate to 26 full-time positions.

## VII. FALSE AND FRAUDULENT CLAIMS AND STATEMENTS

37. Between October 2001 and September 2005, Akal invoiced the United States Marshal's Service and received payments of thousands of dollars from the USMS for security services at the United States Courthouse for the Southern Division of Mississippi for services that were not performed.

38. Specifically, Akal has invoiced the United States Marshals Service for:

    1.    "Service" time when the employee was not present;

    2.    More time than was actually performed on a daily basis;

    3.    Service time when the employee was off-duty (beyond periods contractually allowed) but present;

9

4.  Service time when the employee was on vacation, personal time or on sick leave.

39. More specifically, Akal intentionally and/or knowingly required that the contract personnel each morning record attendance hours for the whole day (8 hours) regardless of whether they work the whole day. This practice violates the express terms of the Contract which requires that the CSOs sign-out when they leave.

40. Contract personnel are encouraged to record as "on-duty" time when they are either not present or "off-duty" and present (beyond periods contractually allowed), both in violation of the contract.

41. While the Contract allows only for two (2) 15-minute breaks and a thirty (30) minute lunch (one hour total off time), the actual schedule for the two shifts in Jackson, Mississippi are as follows:

**First Shift**

At the beginning of the first shift, Akal required all first shift personnel to record their time as 07:15 - 15:45 (8.5 hrs) on the daily time record. However the actual time Akal expected of employees working the first shift is/was 7:30 - 15:20. This period was broken into the following segments:

| First Shift Schedule | Actual "Work" Schedule |
|---|---|
| 7:30 - 8:50 | 1.0 Hr. 20 Min. |
| 8:50 - 9:50 | Off |
| 9:50 - 10:50 | 1.0 Hr. |
| 10:50 - 11:50 | Lunch |
| 11:50 - 13:20 | 1.0 Hr. 30 Min. |
| 13:20 - 14:20 | Off |
| 14:20 - 15:20 | 1.0 Hr. |
| 7 Hrs; 50 Min. | 4.0 Hrs. 50 Min. |

### Second Shift

At the beginning of the second shift, Akal required all second shift personnel to record their time as 09:15 - 17:45 (8.5 hrs.) on the daily time record. However the actual time Akal expected of employees working the second shift is/was 8:50 - 17:20. This period was broken into the following segments:

| Second Shift Schedule | Actual "Work" Schedule |
|---|---|
| 8:50 - 9:50 | 1.0 Hr. |
| 9:50 - 10:50 | Off |
| 10:50 - 11:50 | 1.0 Hr. |
| 11:50 - 1320 | Lunch |
| 13:20 - 14:20 | 1.0 Hr. |
| 14:20 - 15:20 | Off |
| 15:20 - 17:20 | 2.0 Hr. |
| 8 Hrs., 30 Min. | 5.0 Hrs. |

During the First Shift, the employers are/were certifying themselves to have worked 10 minutes more than they were even present, not to mention that the real shift schedule required them to work only approximately 5 hours rather than the 7 required by the Contract. The second shift workers replaced the first shift workers at each post until they were subsequently also relieved. During the "off" or break times and during their lunch break, the contract personnel are allowed to leave the courthouse premises as long as they return for their next scheduled on-duty period. However, even this was routinely not enforced since contract workers often are allowed to take off, run errands or go home early without any change to the daily log.

42.   Akal has known that the Southern District of Mississippi has had no site supervisor on full duty most work days and that the Site Supervisor does not record his time on the daily logs

used by the CSOs. Upon information and belief, this has been occurring daily for years.

43.     Upon information and belief, Akal has known for years that a member of its contract supervisory personnel has routinely consumed alcohol in violation of the contract terms and has been absent from full duty routinely for many years. Each of these practices is known, acquiesced and fostered by Akal management.

44.     Despite the contractual requirements to the contrary, Akal instructed its employees to submit false time records showing full service which are subsequently used to compile the monthly time summaries. Akal submitted false and fraudulent claims, conspired with its employees and supervisors to submit false and fraudulent claims, and fraudulently obtained payments from the United States described above in violation of the various contracts for court and facilities security and the False Claims Act. As a result of Akal's practices, the United States has not received the benefit of its bargain: maximum security and honest work for good pay.

45. Through the practices outlined above, Akal's top management established a corporate climate that tolerated and encouraged wrongful remuneration as one way to ensure profit. Based on the pattern and practice of false records and claims, Akal profited by receiving contractual fees for hourly services which were more than the hourly rates paid to its Court Security Officers ("CSO"), Lead Court Security Officers ("LSCO") and Site Supervisors for hours that are not worked. Akal profited by receiving the over-ride or difference between the contract rate and the rate paid to its hourly employees. Therefore, Akal encouraged, allowed and tolerated employees to be paid when absent and to be paid for more time than actually served. Furthermore, the employees involved consider the CSO job very desirable and even more desirable based on the work actually performed. Thus, all parties involved did not want to "rock the boat." The United States believes that this sort

of conduct has occurred and has been encouraged in other U.S. Court Divisions, not only in Mississippi and the territory of Contract MS-02-0-0001, but also in territories and pursuant to other contracts governing the security of other U.S. government locations throughout the country. At such time as these additional violations become known to the United States, the United States will seek leave to amend this Complaint accordingly. The United States is also in the process of identifying the false claims submitted to other governmental agencies of the United States for other similar security service resulting in the false claims made to the United States, and will seek leave to amend this Complaint accordingly.

## FIRST CAUSE OF ACTION
### (False Claims Act; Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1))

46. Plaintiff realleges each and every allegation at ¶¶ 1-45 as if fully set forth herein.

47. Akal knowingly presented or caused to be presented false or fraudulent invoices/claims for payment and/or approval to the United States, including claims for compensation for services not provided.

48. By virtue of the false and/or fraudulent claims, the United States suffered damage and therefore is entitled to damages under the False Claims Act to be determined at trial, plus a civil penalty of $5,000.00 to $10,000.00 for each violation.

## SECOND CAUSE OF ACTION
### (False Claims Act; Making or Using False Record or Statement to Cause Claim to be Paid)
### (31 U.S.C. § 3729(a)(2))

49. Plaintiff realleges each and every allegation at ¶¶ 1-48 as if fully set forth herein.

50. Akal knowingly compiled, presented, assembled, drafted or caused to be presented false or fraudulent invoices/claims for payment and/or approval to the United States, including

claims for compensation for services not provided.

51. By virtue of the false and/or fraudulent claims, the United States suffered damage and therefore is entitled to damages under the False Claims Act to be determined at trial, plus a civil penalty of $5,000.00 to $10,000.00 for each violation.

### THIRD CAUSE OF ACTION
### (False Claims Act; Conspiring to Submit False Claims)
### (31 U.S.C. § 3729(a)(3))

52. Plaintiff realleges each and every allegation at ¶¶ 1-51 as if fully set forth herein.

53. Akal knowingly conspired with and among its Site Supervisor, Lead CSOs and CSOs to present or cause to be presented false or fraudulent invoices/claims for payment and/or approval to the United States, including claims for compensation for services not provided.

54. By virtue of the false and/or fraudulent claims, the United States suffered damage and therefore is entitled to damages under the False Claims Act to be determined at trial, plus a civil penalty of $5,000.00 to $10,000.00 for each violation.

### FOURTH CAUSE OF ACTION
### (Payment by Mistake of Fact)

55. Plaintiff repeats and realleges ¶¶ 1 through 54 as if fully set forth herein.

56. This is a claim for the recovery of monies paid by the United States to Akal as a result of mistaken understandings of fact.

57. The false claims which Akal submitted to the United States agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

58. The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of defendants' certifications and representations, paid Akal certain sums of money to

which they were not entitled, and Akal is thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

59. Plaintiff repeats and realleges ¶¶ 1 through 58 as if fully set forth herein.

60. This is a claim for the recovery of monies by which Akal has been unjustly enriched.

## SIXTH CAUSE OF ACTION
### (Disgorgement of Illegal Profits for Imposition of a Constructive Trust and an Accounting)

61. Plaintiff realleges each and every allegation at ¶¶ 1-60 as if fully set forth herein.

62. Akal must disgorge all payments and/or amounts to which they are not entitled or which have not been earned and Plaintiff requests the Court to find that Akal holds the Contract proceeds in a constructive trust.

63. The Plaintiffs also request an accounting to determine the amount of money fraudulently obtained.

## SEVENTH CAUSE OF ACTION
### (Recoupment of Overpayments)

64. Plaintiff repeats and realleges ¶¶ 1 through 63 as if fully set forth herein.

65. This is a claim for recoupment, for the recovery of monies unlawfully paid by the United States to Akal contrary to contract, statute or regulation.

66. The United States paid Akal certain sums of money to which it was not entitled, and Akal is thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## EIGHTH CAUSE OF ACTION
### (Common Law Fraud)

67. Plaintiff repeats and realleges ¶¶ 1 through 66 as if fully set forth herein.

68. Akal made material and false representations about the amount of security services it provided on a bi-weekly basis in their requests for contract payments and in their invoices with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment. The United States acted in justifiable reliance upon defendants' misrepresentations by making payments based on the false claims. Akal received the payments knowing that the invoices had inflated the true hours of security services provided.

69. Had the truth facts been known to the United States, Akal would not have received the payments.

70. By reason of these payments and the inflated amounts on the service invoices, the United States has been damaged in an as yet undetermined amount.

## VIII. DAMAGES

71. The United States was damaged because of the acts of Akal in submitting, causing to be submitted or conspiring to submit false claims, statements and records in that it paid Akal for items and services for which they were not entitled to payment and for which USMS did not receive services.

72. Akal profited unlawfully from the payment of the inflated, false invoices.

73. Plaintiff calculates its damages as follows. Each of the full-time equivalent positions has 2007 hours of service allocated to it. The minimum hourly compensation for each of these hours is approximately $18.13. (It is presumed that Akal was paid more by the United States.) Therefore,

in exchange for 8 hours of service daily over the course of a year, each employee was paid a minimum of $36,386.91 annually. However, each day during the relevant period the United States was defrauded by 2 hours per 8 hour day or 25%. This amounts to at least $9,096.72 per employee per year. Since 26 full-time equivalent positions exist in the Southern District of Mississippi, the annual total loss to the United States is at least $236,514.72. Presently, it is believed that this same practice has been followed for over 4 years. Therefore, the total actual damages amount to over $946,058.88.

According to the False Claims Act, the Plaintiff is entitled to recover treble damages of not less than $2,838,176.64.

Because the Act provides for a civil penalty of between $5,000.00 to $10,000.00 per violation and because billing invoices have been fraudulently submitted and payments have been gained fraudulently no less than 96 times, assuming bi-weekly summaries were submitted for four years (plus 1040 additional daily fraudulent documents), Akal owes an additional $480,000.00 to $960,000.00, plus $5,200,000.00 to $10,400,000.00 as a civil penalty for its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants, jointly and severally, as follows:

74. On the First, Second, and Third Causes of Action under the False Claims Act, as amended, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper, including attorneys fees, expenses and all costs of court.

75. On the Fourth, Fifth and Seventh Causes of Action, for payment by mistake, unjust

enrichment, and recoupment, for the damages sustained and/or amounts by which the defendants were unjustly enriched or by which defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper, including attorneys fees, expenses and all costs of court.

76. On the Sixth Cause of Action, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by defendants and such further equitable relief as may be just and proper, including attorneys fees, expenses and all costs of court.

77. On the Eighth Cause of Action, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with reasonable attorneys fees, costs and interest, and for all such further relief as may be just and proper.

THIS the 22nd day of September, 2005.

Respectfully submitted,

UNITED STATES OF AMERICA,
ex rel RAYMOND BURK

RAYMOND BURK

STATE OF MISSISSIPPI
COUNTY OF  Hinds

    This day personally appeared before me, the undersigned authority in and for said jurisdiction, the within named RAYMOND BURK, who, being by me first duly sworn, states that the matters and facts set forth hereinabove are true and correct as stated.

Sworn to and subscribed before me, this the 22nd day of September, 2005.

                                            Tonya Roberson Ham
                                            Notary Public

My Commission Expires:
November 13, 2008

19